IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EARL WILLIAMS, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:10-cv-508-WC |
| | ) | |
| RUSKIN COMPANY, RELIABLE | ) | |
| DIVISION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant's Motion for Summary Judgment (Doc. #35), Plaintiffs'

Opposition (Doc. #44), and Defendant's Reply (Doc. #48).  Also pending before the court,

is Defendant's Motion to Strike Evidentiary Submissions (Doc. #49), Plaintiffs' Response

(Doc. #51), and Defendant's Reply (Doc. #52).  For the reasons that follow, the Motion for

Summary Judgment (Doc. #35) is GRANTED and the Motion to Strike (Doc. #49) is

DENIED.

**I.      STATEMENT OF FACTS**

The court has carefully considered the pleadings in this case and all documents

submitted in support of, and in opposition to, Defendant's Motion for Summary Judgment.

The submissions of the parties, viewed in the light most favorable to the non-moving party,

establish the following relevant facts:

Plaintiffs are current employees of Defendant Ruskin Company, Reliable Division

("Defendant").  All four plaintiffs are African American.

Defendant manufactures louvers and grilles for use in air conditioning units. Defendant's facilities are located in Geneva, Alabama. Defendant has approximately 465 employees in the Geneva plant. Defendant has a number of different departments and each department has several job categories. For example, in the production departments, job categories include: assembler, lead person, assistant supervisor, and supervisor. Supervisors report to production managers and production managers report to the plant manager.

George Helms has served as Human Resources Manager of Defendant's Geneva plant since 1992. David Burch has served as Plant Manager of the Geneva Plant since July of 2008.

Defendant's equal employment opportunity and anti-harassment policies are found in an employee handbook. This employee handbook is distributed to all employees at least once at the time of hiring and is updated periodically. Each Plaintiff received a copy of the handbook on at least one occasion.

Sometime in 2008, three African American employees (not the Plaintiffs) working in the Paint Shop found a monkey doll hanging by a noose in each of their lockers. These three employees were the only black employees in that department. Following this incident, Defendant conducted an internal investigation and hired a third-party law firm to conduct a separate investigation. Neither investigation was able to determine who was responsible for the incident. Defendant followed up with each of the complaining employees. In

September 2008, Defendant hired another third-party law firm to conduct an anti-harassment training for all employees.

Plaintiffs' claims in this lawsuit arise from their work in Ruskin Company, Reliable Division. On March 23, 2009, Plaintiffs collectively filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission. Plaintiffs filed suit in this federal court on June 11, 2010, alleging discrimination in promotion decisions and a racially hostile work environment.

**The Plaintiffs:**

### 1.   Earl Williams

Earl Williams has been employed by Reliable since April 26, 1977 and has worked in several parts of Reliable's Geneva plant since then. He does not have a high school diploma and has limited computer skills. He was initially hired as an Assembler and currently works in Department 15 assembling louvers by screwing and welding blades together in a personal work area.

### 2.   Rebecca Williams

Rebecca Williams does not have a high school diploma and has been employed by Reliable since January 27, 1986. She was initially hired as an Assembler and currently works as a Large Punch Press Operator. During her time at Reliable, her work has been supervised by Eddie Ward up until two years ago when Terry Rogers became her supervisor.

### 3.    Willie Johnson

Johnson has a degree in communications electronics and was first hired by Reliable in March 2003.  Johnson resigned from his job in September 2005, indicating that he felt Reliable does not "treat blacks fairly."  Pls.' Brief (Doc. #44) at 6.  In November 2006, Johnson was rehired to work in the Paint Shop.  Johnson currently works as a Crane Operator in the Anodizing Department.  Johnson's current Lead Person is Mickey Soles and his Supervisor is John Drake.

### 4.    Erica Barefield

Barefiled has a high school diploma and was initially hired by Reliable as an entry-level Assembler in 1994, but her employment was terminated during the probationary period for lack of productivity.  On November 20, 1995, Barefield was rehired as an Assembler in Department 3.  In 1998, Barefield was promoted to Wrapper, a position she held until 1999. In or around the year 2000, Barefield was promoted to Wire Retain.  In or around 2002 or 2003, Barefield was promoted to her current position of Small Press Operator in Department 3.  Her current supervisor is Terry Rogers.  Eddie Ward has been Barefield's Supervisor or Assistant Supervisor throughout her employment at Reliable.  While at Reliable, Barefield has never asked for or expressed any interest in any type of training, acquiring any skills, or taking any classes.  Barefield Depo. at 77-78.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]   Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion[,]" and alerting the court to portions of the record which support the motion. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the non-movant is then similarly required to cite to portions of the record which show the existence of a material factual

---

[1] On December 1, 2010, amendments to Rule 56 became effective.  The amendments to Rule 56 generally reorganize the provisions of the Rule and incorporate language which is "intended to improve the procedures for presenting and deciding summary judgment-motions and [is] . . . *not intended to change the summary-judgment standard or burdens.*" *Farmers Ins. Exchange v. RNK, Inc.*, __ F.3d __, 2011 WL 183969 at *9 n.4 (1st Cir. Jan. 21, 2011) (internal quotations omitted) (emphasis in original).  Moreover, because the summary judgment standard remains the same, the amendments "will not affect continuing development of the decisional law construing and applying" the standard now articulated in Rule 56(a).  Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendments.  Accordingly, while the court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule.

dispute. *Id.* at 324. In doing so, and to avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the non-movant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the non-moving party has responded to the motion for summary judgment,

the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## III.  DISCUSSION

Defendant has moved for summary judgment as to all of Plaintiffs' claims. The court will address Defendant's arguments below.

### A.  Timeliness of Plaintiffs' suit

Plaintiffs bring suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981.[2] Defendant contends that any Title VII claims alleging discrete acts of discriminatory conduct predating September 24, 2008 are time-barred as Plaintiffs filed their EEOC charge on March 23, 2009 and, thus, any claims filed outside of September 24, 2008 would fall outside of the 180-day statute of limitations period for filing an EEOC charge. As to Plaintiffs' § 1981 claims, Defendant contends that only discrete acts occurring between June 11, 2006 and June 11, 2010 are timely under Section 1981's four-year statute of limitations. While Defendant's position is potentially meritorious, the court ultimately need not determine whether such claims are time barred because, for the reasons given below, Defendant is entitled to summary judgment on the merits of Plaintiffs' discrimination claims.

---

[2] Plaintiffs bring suit under both Title VII and Section 1981. The legal analysis is the same under both statutes. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009) (noting that discrimination claims brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework).

### B.    Failure to Promote Claim

Plaintiffs claim race discrimination in promotion, alleging "there was no true promotion procedure that allowed for [them] to compete with whites and that the positions were given to the white employees because of [their] race, black." Pls.' Am. Compl. (Doc. #3) at 2. Because Plaintiffs' failure to promote claim relies on circumstantial evidence, it is analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under the *McDonnell Douglas* framework, Plaintiffs must first create a presumption of discrimination by establishing a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. Plaintiffs may establish a *prima facie* case in a failure to promote case through circumstantial evidence by proving that: (1) they belong to a protected class; (2) they applied for and were qualified for a promotion; (3) they were rejected despite their qualifications; and (4) other equally or less-qualified employees outside their class were promoted. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). The comparators for the fourth prong must be "similarly situated in all relevant respects." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

If Plaintiffs establish a *prima facie* case of race discrimination in promotion decisions, Defendant can offer a legitimate, nondiscriminatory reason for not promoting Plaintiffs and thereby rebut their *prima facie* case. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509

(1993).  *See also McDonnell Douglas*, 411 U.S. at 802.  Defendant's burden is "exceedingly light" and Defendant must merely proffer a non race-based reason for the adverse employment action, not prove it.  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).  Defendant's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  So long as the employer articulates a "clear and reasonably specific" nondiscriminatory reason for its actions, it has discharged its burden of production.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

To avoid summary judgment, Plaintiff "must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted).  In order to show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision.  . . . [A plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.  "If the plaintiff does not satisfy her burden of establishing a genuine issue of material fact that the employer's reason was pretextual, the grant of summary judgment in favor of the employer is proper."  *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529

(11th Cir. 1997)).

### 1.    The Burden-Shifting Analysis

Defendant argues that Plaintiffs' "promotion claims fail because, in each instance, (1) the claims are untimely; (2) [Plaintiffs] fail to meet the qualification prong of the *prima facie* case; and/or (3) [Plaintiffs] fail to rebut as pretext Reliable's legitimate, non-discriminatory reasons." Def.'s Brief (Doc. #37) at 45.

### a.    Earl Williams

On or about June 12, 2009, Defendant posted a production Lead Person position ("GEN-154"). Earl Williams told Human Resources Manager George Helms that he was interested in applying for the GEN-154 position. Sometime thereafter, the job posting was removed and the position went unfilled. Defendant indicates that the job posting was removed after the Production Manager explained to Helms that he needed to fill an office position, not a position on the production floor. Def.'s Brief (Doc. #37) at 16.

In or about August 2009, an Architectural Office Lead Person position ("GEN-187") was posted. The GEN-187 position was an office position and required computer skills. Earl Williams was given a questionnaire for the GEN-187. Earl Williams did not submit the job questionnaire. The GEN-187 position was awarded to Debbie Goodson (white).

Aside from the GEN-154 and GEN-187 positions, Earl Williams indicates that there were other positions in which he expressed an interest. However, because there is no record that he ever applied to any other positions, the court will analyze his failure to promote claim

only with respect to the GEN-154 and GEN-187 positions.[3]

Earl Williams cannot make out a *prima facie* case with respect to the GEN-154 position.  Because the facts show that the GEN-154 position was not filled and Earl Williams has offered no evidence or argument to show that "other equally or less qualified employees who were not members of the protected class were promoted," *Wilson*, 376 F.3d at 1089, to the GEN-154 position, he cannot make out a *prima facie* case with respect to this position.[4]

Earl Williams also cannot establish a *prima facie* case with respect to the GEN-187 position.  Earl Williams failed to submit the job questionnaire for this position, and so he did not actually apply for the job.[5]  *See Denson v. City of College Park*, 2009 WL 302192, at *16 (N.D. Ga. Feb. 5, 2009) ("In workplaces where an employer has a system of advertising job

---

[3] *See, e.g.*, *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) ("A general interest in being rehired without submitting an application is not enough to establish a *prima facie* case of age discrimination when the defendant-employer has publicized an open position.").

[4] *See, e.g.*, *Bryant v. Dougherty Cnty. Sch. System*, 2009 WL 3161678, at *8 (M.D. Ga. Sept. 28, 2009) "The facts clearly show that the position . . . was not filled.  Because Plaintiff has offered no evidence or argument to show that the . . . position was filled by someone outside of her protected class, any claim by Plaintiff of discriminatory failure to promote on the basis of race and/or sex pursuant to Title VII must fail as to this individual position.").

[5] Plaintiff argues that the GEN-154 and GEN-187 positions are the same and that the GEN-154 position was taken down and changed after he expressed an interest in the position.  According to Plaintiff, "[i]n light of the fact that Earl Williams applied, there were two noteworthy changes to the job description," the educational requirement was changed "from High School **education** or equivalent preferred" to "High School **diploma** or general education degree (GED)" and "specific computer skills were added and listed as 'required.'"  Pls.' Brief (Doc. #44) at 99 (emphasis in original).  Other than his own belief, Earl Williams presents no evidence to prove the jobs were the same.  Defendant has indicated that the jobs differed in that one was an office position while the other was a job on the production floor.  Because the job descriptions reveal different titles and qualification requirements, the court concludes the postings referred to two different positions.

openings and allowing employees to apply for them, an employee who fails to apply for a particular position is unable to establish a *prima facie* case of discrimination." (citing *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003)).[6]

Even assuming Earl Williams applied for the position, he did not demonstrate that he was qualified for the GEN-187 position because he did not show that he satisfied Defendant's objective qualifications. In this case, Earl Williams lacks the required computer skills. *See Vessels v. Atlanta Independent Sch. System*, 408 F.3d 763, 769 (11th Cir. 2005) (finding that in order for a plaintiff to make out a *prima facie* case for failure to promote under Title VII, a plaintiff must "show that he or she satisfied an employer's objective qualifications").

Moreover, even assuming Earl Williams established a *prima facie* case, Defendant has indicated that it promoted Goodson because her qualifications were superior. Specifically, Defendant indicates that Earl Williams "was objectively less qualified than Goodson" because "Goodson, unlike Earl, returned the required questionnaire, possessed the requisite computer skills, has a high school diploma and a degree from Washington Holmes Vocational-Tech Center with Practical Computer Certification, had previously performed secretarial work at Reliable, and had seventeen years of experience as a Section Leader at her previous employer." Def.'s Brief (Doc. #37) at 48. Thus, Defendant has offered a

---

[6] Moreover, Earl Williams' failure to apply for the GEN-187 position also means he was not rejected for that position. Rejection from a position is also necessary to establish a *prima facie* case.

legitimate, nondiscriminatory reason for its promotion decision.

"When an employer offers as its reason for not promoting a plaintiff the assertion that the person who was promoted was 'more qualified,' that allegation casts upon plaintiff the burden to demonstrate that the stated reason is pretextual." *Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1149 (N.D. Ala. 2011).  In order for a plaintiff to be successful, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000).  *See also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006) (per curiam) (same); *Tippie v. Spacelabs Medical, Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) (same).  Earl Williams offers no evidence to rebut Defendant's argument that Goodson was more qualified for the job.  Plaintiff's argument suggests that he has other valuable experience that should have been considered.  Specifically, Earl Williams argues that "Defendant looks beyond white candidates' experience at the plant to find experiences to justify a promotion" but, in contrast, "Plaintiffs' outside experience is [sic] never considered."   Pls.' Brief (Doc. #44) at 101.  For example, Earl Williams asserts he has other qualifications, indicating that he "is a Reverend and is obviously a leader when one considers the years of willingness to bring problems of discrimination to the plant managers and the HR Director."  Pls.' Brief (Doc. #44) at 101.  However, these outside qualifications do not change the fact that Earl Williams did not meet the objective requirements of the position and that Goodson's "prior secretarial

13

experience and section leader experience with a prior employer," Pls.' Brief (Doc. #44) at 101, was relevant to the position.  Plaintiff is not allowed to substitute his business judgment for that of the employer nor can Plaintiff "succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Indeed, "a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as long as the reason is one that might motivate a reasonable employer." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation omitted).  *See also Rowell v. BellSouth Corp.*, 433 F.3d 794, 798–99 (11th Cir. 2005) (explaining that "[i]t is by now axiomatic that we cannot second-guess the business decisions of an employer").  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Harrell v. Alabama Dep't of Educ.*, 342 F. App'x 434, 436 (11th Cir. 2009) (quoting *Chapman*, 229 F.3d at 1030).

Earl Williams does not argue that he was more qualified than the selected candidate and, in reviewing the record, the court finds he has failed to establish that a disparity in qualification existed that was of such weight and significance that no reasonable person could have chosen Goodson over him.  On the contrary, a reasonable employer could have chosen Goodson for the position given her education and relevant experience.  Thus, Earl Williams's failure to promote claim is due to fail.

**b.      Rebecca Williams**

Rebecca Williams alleges that she has applied for three positions with Reliable which she did not receive:  1) Department 4 Lead Person (May 2006); 2) Department 3 Lead Person (May 2007); and 3) Department 3 Assistant Supervisor (March 2008).  The job posting for a Lead Person position included qualification requirements indicating "high school education or equivalent preferred; previous factory experience required."  Def.'s Ex. B (Doc. #36-3) at 115.

The Department 4 Lead Person position was awarded to Dale Presley.  Reliable indicated that Presley was selected for the position because he has a high school degree and "because he has previously held essentially the same position when he served as Lead Person over the 'filter line' in Department 3 and had performed well in that position."  Def.'s Brief (Doc. #37) at 19.  Additionally, Presley "had directly relevant supervisory experience being the Lead Person over that product line.  Rebecca, by contrast, has no supervisory experience at Reliable."  Def.'s Brief (Doc. #37) at 51.

The Department 3 Lead Person position was awarded to Janet Armstrong.  Applicants to the Department 3 Lead Person position were asked to complete and submit a job questionnaire.  Rebecca Williams did not return a job questionnaire for the Department 3 Lead Person position.  Defendant indicates that her failure to complete the questionnaire "result[ed] in her disqualification from the position."  Def.'s Brief (Doc. #37) at 51.  Armstrong completed the questionnaire.  Defendant indicated that Armstrong was selected

for the position because she graduated high school and "because of [her] energetic, enthusiastic personality."  Def.'s Brief (Doc. #37) at 20.

Rebecca Williams was interviewed for the Department 3 Assistant Supervisor position, but the position was awarded to Janet Armstrong.  Reliable indicated that Armstrong was selected for the position "because Armstrong was both qualified for the position and had served successfully as a Lead Person for approximately one year, demonstrating the types of leadership skills necessary for an Assistant Supervisor position."  Def.'s Brief (Doc. #37) at 21, 52.

The postings for the Lead Person positions required a high school education.  Rebecca Williams does not have a high school diploma.  Thus, she cannot make out a *prima facie* case with respect to the Lead Person positions because she cannot meet the objective requirements for these positions.  Neither can Rebecca Williams establish a *prima facie* case with respect to the Assistant Supervisor position because Defendant's evidence demonstrates that the selected candidate had superior qualifications.  As with Earl Williams, Rebecca Williams indicates that she has other qualifications that were not considered, specifically, stating that "Rebecca is a civic leader."  Pls.' Brief (Doc. #44) at 101.  This kind of assertion is insufficient to make out a *prima facie* case.  In all three instances, the selected individual had a superior educational background to Rebecca Williams and previous experience relevant to the position.  Thus, the court finds that she is unable to establish a *prima facie* case.

Even were the court to assume that Rebecca Williams had established a *prima facie*

16

case of discrimination, Defendant has provided nondiscriminatory reasons for selecting the other individuals for promotion and provided evidence establishing that a reasonable employer could have chosen those candidates over Rebecca Williams for the positions. Rebecca Williams has failed to rebut the nondiscriminatory reasons set forth by Defendant. Accordingly, Defendant is entitled to summary judgment on this claim.

### c.   Willie Johnson

In or about November 2007, Defendant posted an Assistant Supervisor position in the Anodizing/Crane Department.  Johnson maintains that he applied for the position, but Defendant indicates that its records reflect that Johnson did not apply for the position.  The position was awarded to Randy Enfinger.  Defendant indicates that Enfinger was selected for the position because he "had extensive experience in the Anodizing Department, including: Loader/Unloader, Waste Treatment Plant Operator, and Lead person;" "had operated cranes in several of his prior jobs at Reliable and on an as-needed basis;" and had been working in the Crane Department longer than Johnson.  Def.'s Brief (Doc. #37) at 22-23, 55.

In or about July 2007, Johnson applied for a Lead Person position in the Paint Department.  The position was awarded to Tony McKee.  There were seven applicants for the position.  All but Johnson were white.  Of the seven applicants, McKee had the least seniority.  Defendant indicated that McKee was selected for the position because:

> during his short tenure with Reliable, McKee had established himself as someone with leadership skills.  (Drake Decl. ¶ 3).  He had a clear knowledge of the job and the responsibilities associated with it, he took pride in tasks that he was assigned, he gained the respect from fellow employees in a short period

17

of time, he had good communication skills, and he understood Lean Manufacturing, which management considered a foundational skill upon which both McKee and the company could build. (Drake Decl. ¶ 3).

Def.'s Brief (Doc. #37) at 23.

In or about August 2007, Johnson applied for an Assistant Supervisor position in Department 6. The position was awarded to Rob Hadden. According to Defendant, Hadden was selected for the position because he "had previously been a Lead Person in Department 6, had worked as a manufacturing clerk and a customer service representative, had gone to community college for computer technology, and had acquired supervisory experience during his time in the Air Force." Def.'s Brief (Doc. #37) at 24. Johnson had not previously worked in Department 6.

Defendant argues that Johnson cannot make out a *prima facie* case because his poor attendance and disciplinary record for sleeping on the crane disqualified him from a promotion. Def.'s Brief (Doc. #37) at 54. Johnson admits that "[he] has long history of attendance problems," and admits he has been disciplined for "'being asleep on the crane.'" Pls.' Brief (Doc. #44) at 6-7. However, Johnson does seem to argue that his poor attendance and disciplinary record improved after he was rehired in 2006 and that he had no infractions from the time he was rehired in 2006 until after he was denied a promotion.[7] Johnson's argument is not persuasive. Even if he managed to have a clean disciplinary record upon

---

[7] Johnson argues "[t]he defendant points to disciplinary actions for being late and for sleeping to justify the failure to promote. The only disciplinary actions that Willie had prior to seeking the promotions related to his previous time of employment with the defendant. He had no disciplinary actions at all after his return to [R]eliable until after he was turned down for these promotions." Pl's Brief (Doc. #44) at 89 n.13.

18

being rehired in 2006, he does not challenge the fact that he did have previous disciplinary infractions. A candidate's disciplinary record is an objective factor the employer may consider and it is not unreasonable for Defendant to consider his entire record when making a promotion decision. It is also not unreasonable that a candidate's disciplinary record, even a past record, might make him a less desirable candidate. Thus, Johnson's attendance and disciplinary record prevent him from establishing that he was qualified for the position. *See, e.g.*, *LeBlanc v. TJX Companies, Inc.*, 214 F. Supp. 2d 1319, 1329-30 (S.D. Fla. 2002) (finding that plaintiff failed to establish qualification prong for *prima facie* case in failure to promote claim under Title VII and the ADEA; employee had spotted disciplinary record, had received customer complaints against him, and had low performance rating for previous fiscal year).

Moreover, Johnson cannot satisfy the fourth prong of his *prima facie* case. Johnson admits he does not know about the qualifications and disciplinary record of the selected candidates. He points out that "a co-worker, J.K. 'clocks in late just as much as [he] do[es]'" and that "three specific Caucasian employees have also fallen asleep on the crane," but admits that he "has been told that they have been disciplined for doing so." Pls.' Brief (Doc. #44) at 8.[8] Accordingly, Johnson has not demonstrated that the selected candidates were similarly situated to him in all respects. *See, e.g.*, *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31-32 (1st Cir. 2008) (concluding that plaintiff and her proffered comparator were

---

[8] These co-workers were not the individuals selected for the positions in question.

not similarly situated because the plaintiff had received "a far more negative . . . year-end assessment" and had a history of work-related problems and warnings).  Thus, the court finds Johnson has not established a *prima facie* case.

Even assuming Johnson can establish a *prima facie* case, Defendant has proffered a non-discriminatory reason for not promoting him.  The burden then shifts to Johnson. Defendant argues that "Johnson cannot meet his pretext burden" because "Johnson cannot demonstrate that he has superior qualifications due to the fact that each of the selectees was more qualified than he [sic] on the basis of some or all of the following criteria:  experience, demonstrated leadership qualities, seniority and/or attendance record."  Def.'s Brief (Doc. #37) at 56-57.  Johnson does not challenge Defendant's argument that he was less qualified for the promotions.[9]  This is insufficient to rebut Defendant's explanation for its promotion decision as false and pretextual.  Thus, his argument must fail.

### d.    Erica Barefield

In or about the fall of 2007, Defendant posted an Engineering Secretary position. Barefield expressed her interest in the position to George Helms.  Cal Sherrouse decided which candidates to interview for the position.  After reviewing Barefield's Job Bid Information Sheet, which indicated that Barefield had been disciplined for "using abusive

---

[9] As with the other Plaintiffs, Johnson points to the fact that "Willie has managed to keep two full time jobs."  Pls.' Brief (Doc. #44) at 101, as demonstrative of the qualifications he possesses. As in the case of the other Plaintiffs, this kind of assertion does not establish that Johnson was qualified for the positions in dispute in this case.

language" on May 23, 2006, Sherrouse decided not to interview Barefield for the position.[10]
The position was awarded to Janet Grubbs.  Reliable indicated that Grubbs was selected for
the position because "she had an associate degree in computer and information sciences,
had experience as a Lead Person, and had worked extensively with the MacPac computer
program that would be used by the person filling the position. . . .  Furthermore, . . .
product knowledge was critical. . . . Because of Grubbs' experience in the department, she
knew the product well . . . .  Barefield,  in contrast, had no experience in the department
and no product knowledge."  Def.'s Brief (Doc. #37) at 27 (internal citations omitted).

Barefield points to qualifications she believes made her a good choice for the
secretary position.  Barefield asserts that she "was not interviewed or tested like the other
applicants.  If she had been, she believes her calculation and typing speed would have been
better.  It also would have been discovered that she had secretarial experience outside
Reliable that included knowledge of computers." Pls.' Brief (Doc. #44) at 94.  However,
Barefield does not provide any evidence to demonstrate that she was more qualified than
the selected candidate.  Her argument is speculation at best and is insufficient to make out
a *prima facie* case of discrimination.[11]  *See Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181

---

[10] In or about "May 23, 2006, Barefield was disciplined for yelling at a Caucasian co-worker that
she didn't care whether [the co-worker] was pregnant or not, [Barefield] was going to whoop her
ass."  Pls.' Brief (Doc. #44) at 10.

[11] The court notes that Plaintiffs' brief indicates that Barefield has received promotions in the
past.  In 1998, Barefield was promoted to "Wrapper," in or around 2000, she was promoted to
"Wire Retain," and in or around 2002 or 2003, she was promoted to her current position of
"Small Press Operator" in Department 3.  Pls.' Brief (Doc. #44) at 9.

(11th Cir. 2005) ("Speculation does not create a genuine issue of fact[.]").  Thus, Barefield cannot establish that she was qualified for the secretary position.

Even assuming Barefield has established a *prima facie* case, she fails to rebut Defendant's nondiscriminatory reason for its promotion decision.  Barefield seems to argue that Defendant's stated reason not to interview her because of her disciplinary record is pretextual because "a white woman with a three year history of disciplinary/attendance problems is promoted and Eric[a] Barefield is not because of a single incident." Pls.' Brief (Doc. #44) at 120.  However, Barefield provides no evidence to establish that Grubbs's disciplinary record was similar to or worse than her own.  Moreover, even assuming both Grubbs and Barefield had blemished disciplinary records, it would be reasonable for Defendant to select Grubbs given her relevant experience, which included experience in the Engineering Department and experience with the MacPac program as well as her knowledge of the product.  While Barefield points to previous secretarial experience and computer knowledge, she presents no evidence to show that the "disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Grubbs] over [her] for the job in question." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000).  Thus, Barefield fails to rebut Defendant's proffered nondiscriminatory reason.

### 2.    Other Arguments

Plaintiffs argue that "[t]he practice at the Geneva plant is to pick someone for a

position, train them, and then post the position." Pls.' Brief (Doc. #44) at 30 (citing to Frank Lett's Decl.). Even if the selected candidates were preselected, Plaintiffs have failed to show that preselection was based on racial animus. First, as discussed above, the selected candidates in each case had higher qualifications than the Plaintiffs. Thus, even if these candidates were preselected, it does not show racial animus because their qualifications are superior. Courts have found that "preselection does not necessarily violate Title VII if it is made on the qualifications of the preselected party." *Dorrego v. Public Health Trust of Miami Dade Cnty.*, 293 F. Supp. 2d 1274, 1286 (S.D. Fla. 2003) (citing *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir. 1979)); *Alexander v. Baldwin Cnty. Bd. of Educ.*, 2008 WL 3551194, at *7 (S.D. Ala. 2008) ("Indeed, preselection of the most qualified candidate is a legitimate nondiscriminatory reason."). Moreover, as Defendant points out, both Caucasian and African American employees have benefitted from promotions to positions that were not posted, including Plaintiffs Earl Williams and Johnson.[12] Def.'s Brief (Doc. #37) at 13. Indeed, in arguing Defendant uses a racially biased preselection process, Plaintiffs themselves point to Plaintiff Johnson's preselection for a job:

> The company, through its designated representative, acknowledges this [preselection] process. The following is from the deposition of the 30(b)(6) representative regarding Willie Johnson:
> A. . . . I know Willie wanted to change departments and learn how to run the crane, and he expressed that concern or that desire - -

---

[12] Defendant also indicates that Calvin Grooms and Frank Lett were awarded Lead Person positions that were not posted. Def.'s Brief (Doc. #37) at 12.

Q. With you?
A. No with the supervisor.
Q. What happened?
A. **He went to the anodizing department and they showed him how to run the crane and they posted the job later and he got the job.**
(Helms/30(b)(6) representative, pages 56.13 – 57.8)

Pls.' Brief (Doc. #44) at 91-92 (emphasis in original).  Additionally, as Defendant points out, the law in this circuit does not support Plaintiffs' argument.  *See e.g.*, *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007) ("[E]ven where preselection violates corporate personnel policies, it does not necessarily indicate racial discrimination."); *Nance v. Ricoh Elec., Inc.*, 381 F. App'x 919, 922 (11th Cir. 2010) ("Even if the position was not posted, however, we have held that the failure to post a job, 'even where preselection violates corporate personnel policies, . . . does not necessarily indicate racial discrimination.') (quoting *Springer*); *Alexander*, 2008 WL 3551194, at *7 (preselection alone is not evidence of pretext or discriminatory intent) (Internal citations omitted).  Thus, the court finds that Plaintiffs' preselection argument must fail.

Plaintiffs also argue that Defendant's racially biased promotion process is evident because "blacks do not participate in employment decisions because there are no blacks in management."  Pls.' Brief (Doc. #44) at 16 (citing to Earl Williams Decl.).  Some courts have found that when a "promotion system utilizes subjective evaluations by all white supervisors it provides a ready mechanism for discrimination."  *Hamilton v. General Motors Corp.*, 606 F.2d 576 (5th Cir. 1979); *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972).  The problem for Plaintiffs is that this argument carries more weight when

the entire promotion process is subjective.  That is not the case here since Defendant's articulated reason for not promoting Plaintiffs is that they did not meet the *objective* promotion criteria because the selected candidates had superior qualifications with respect to educational background and relevant experience.  *See, e.g.*, *Hamilton*, 606 F.2d at 580 ("We are aware of no holding to the effect that a complainant who fails to satisfy a valid objective hiring criterion may nonetheless make out a *prima facie* case under *McDonnell* and *Rowe* by pointing to what may be considered an impermissible subjective interview.").

Plaintiffs also point to the Employee Handbook in arguing that in some instances Plaintiffs' seniority should have weighed more heavily in their favor for the positions.  In relevant part, the handbook states "key considerations in these personnel actions include the opportunity for employee growth and development, enhancement of job satisfaction, qualifications, and contributions to a productive organization.  **Where these factors are equal, seniority will tip the scales in favor of the senior employee**." Pls.' Ex. (Doc. 43-1) at 2-3 (emphasis added).  However, all factors were not equal in this case because the Plaintiffs had less education and/or experience than the selected candidates.  Moreover, Defendant argues that even if Reliable has failed to promote individuals based on seniority, this does not show racial bias because African American employees have also been promoted over more senior Caucasian employees.  Defendant indicates that "when an African-American applicant is the most qualified applicant, as with several Lead Person positions over the years, the African-American applicant has received the position,

regardless of seniority.  For example, Melvin Bryant and Mickey Soles were awarded Lead person positions over more senior Caucasian applicants."  Def.'s Reply Brief (Doc. #48) at 16.  Accordingly, because Plaintiffs have failed to show that all factors were equal in each of the promotion decisions in dispute and because they fail to rebut Defendant's evidence that African American employees have also been promoted over more senior Caucasian employees, Plaintiffs' seniority argument must fail.

Even if Plaintiffs could meet their burden of demonstrating a *prima facie* case of race discrimination in promotion decisions, Defendant would nevertheless be entitled to summary judgment on each of their claims.  Plaintiffs have failed to cast sufficient doubt on Defendant's proffered legitimate and nondiscriminatory reason—that its hiring decisions were based upon qualifications and not race.  Thus, for the reasons described above, Plaintiffs cannot withstand summary judgment on their failure to promote claims and Defendant's motion is due to be granted as to this claim.

## C.    Hostile Work Environment

Plaintiffs also assert a hostile work environment claim alleging race-based harassment.  A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal citation and quotation marks omitted); *see also*

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993).

To establish a *prima facie* case for a hostile work environment claim, Plaintiffs must show that:  (1) they belong to a protected group, (2) they have been subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment, and (5) the employer is responsible for such environment under either a theory of vicarious or of direct liability.  *Miller*, 277 F.3d at 1275.  Taking the evidence in the light most favorable to Plaintiffs, the court finds that Plaintiffs cannot satisfy elements four and five and, thus, cannot make out a *prima facie* case.

> **1.      Whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment.**

The requirement that the harassment be "severe or pervasive" under element four contains both an objective and subjective component.  *Miller,* 277 F.3d at 1276.  Indeed, "[i]t is the fourth element—sufficiently severe or pervasive harassment—that 'tests the mettle of most . . . harassment claims.'"  *Alexander v. Opelika City Bd. of Educ.*, 2008 WL 401353, at *3 (M.D. Ala. 2008) (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)).  In evaluating the severity of alleged harassment, there are four factors to be considered:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."

*Miller*, 277 F .3d at 1276; *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

Because each of the Plaintiffs must individually make out a *prima facie* case, the court analyzes each Plaintiff's individual hostile work environment claim.

### a.    Earl Williams

Earl Williams's hostile work environment claim is based on the following allegations:

- He saw a confederate flag hung at Defendant's Geneva plant in the 1980s.[13] Earl Williams Depo. at 182-84.
- Sometime in 2005, he was called "boy" by a co-worker named "Pee Wee" Yarborough (white).[14]  Earl Williams Depo. at 87.
- Arnold Boyd or Doug Pope also have used the term "boy" to refer to Earl Williams.  Pls.' Brief (Doc. #44) at 17.
- Earl Williams has heard Charlie Cox (black) called "boy" more than once. Pls.' Brief (Doc. #44) at 16; Earl Williams Depo. at 310.
- Sometime in 2005, Earl Williams had a conflict with co-worker Jeff Harley. During the conflict, Harley called Earl Williams an "egg sucking dog." "Earl construed [this phrase] as meaning '[t]hat [he] sucked up to white people.'" Pls.' Brief (Doc. #44) at 4; Earl Williams Depo. at 83.
- Earl Williams "has been accused by a white supervisor of having an 'attitude.'"  Pls.' Brief (Doc. #44) at 22.
- In 2008, Earl Williams heard from three African American co-workers, including Tim Straw, that they found monkey dolls hanging by nooses in their lockers.   Earl Williams Depo. at 313.
- In 2008, Earl Williams heard that someone at Reliable wore a white hood that resembled a hood worn by the Ku Klux Klan.  Pls.' Brief (Doc. #44) at 50.
- Approximately two years ago, Earl Williams heard two co-workers (two fellow

---

[13] According to Earl Williams, the flag was removed "probably . . . within 18 years [ago] or something."  Earl Williams Depo. at 184.

[14] Earl Williams complained about being called "boy" and Human Resources instructed Yarborough to stop making such comments.  Earl Williams Depo. at 86-87.

welders named Jolly and Basil) use the "n" word to refer to him.  He also "knows that they, Jolly and Basil, have said n_____ to Charles Cox."  Pls.' Brief (Doc. #44) at 51.

- Earl Williams heard from co-worker Ted Hampton that production manager Kenny Taylor had used the "n" word sometime in 2010 stating that there would never be any African American members of Reliable management.[15]

- Earl Williams saw swastikas and the letters "KKK" written on the bathroom wall.  Earl Williams Depo. at 223-24 & 228-29.

- Approximately three years ago, Lead Person Doug Pope (white) watched Earl Williams go into the bathroom.  Earl Williams believes Pope did not do the same to white employees.  Earl Williams Depo. at 185.[16]

- Earl Williams alleges that he requested and was denied training opportunities.  Pls.' Brief (Doc. #44) at 33; Earl Williams Depo. at 201-04.

- Earl Williams indicates that if black employees "stopped for a minute or what-have-you" they would be told "y'all boys need to get back to work, y'all break this up."  Earl Williams Depo. at 190.

- Approximately two years ago, Corky Newman told Earl Williams "I'm going to ride you harder than you ever been rode before."  Earl Williams Depo. at 192.

Earl Williams's allegations are insufficient to make out a *prima facie* case.  Taking his allegations as true, they are not sufficiently severe or pervasive.

First, some of Earl Williams's allegations are non-racial in nature and he has not demonstrated that there was a racial animus behind the allegations.  For example, being told he has an "attitude" does not necessarily indicate racial hostility.  *See, e.g.*, *Blick v. Pitney*

---

[15] Defendant indicated that it investigated this allegation and that Hampton admitted that he made up this false allegation.  However, Plaintiffs have provided an affidavit from Hampton where he states:  "I never stated that Kenneth Taylor <u>Never</u> used the 'n' word.  I did however state that I never heard him used it <u>towards</u> frank Lett."  Ted Hampton Decl., Pls.' Ex. 11 (Doc. #40-4) at 5.

[16] Specifically, Earl Williams indicates that "[Pope] was peeping in the doorway, standing in the doorway behind stuff peeping to see where I was going, what I was doing, where was I going, what was I fixing to do when he didn't do it to white employees."  Earl Williams Depo. at 185.

*Bowes Mgmt. Servs., Inc.*, 1995 WL 791945, at *5 (D. Mass. Dec. 26, 1995) (noting that a plaintiff's mere disagreement with the employer's "assessment of his work attitude . . . is not sufficient to create a triable federal discrimination claim").

Moreover, the fact that many of the allegations used to bolster Earl Williams's claim are based on comments and incidents he heard second-hand through his co-workers, and were neither experienced nor witnessed directly by him, weakens the severity of his allegations.[17]  The court does not find that second-hand comments are irrelevant to a hostile work environment claim.[18]  The court only finds that these types of conduct are not as severe as comments and conduct that a plaintiff hears or experiences first-hand.[19]

With respect to the allegations of conduct Earl Williams experienced first-hand, the

---

[17] *See, e.g.*, *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 n. 9 (7th Cir. 2000) ("'[T]hrough the grapevine' or 'second-hand' conduct is not sufficiently severe or pervasive so as to create a hostile work environment."); *Caruso v. City of Cocoa, Fla.*, 260 F. Supp. 2d 1191, 1221-22 (M.D. Fla. 2003) (finding that offensive comments made outside of plaintiff's presence were not severe (citing *Hudson v. Norfolk S. Ry.*, 209 F. Supp. 2d 1301, 1314 (N.D. Ga. 2001) and *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, 1577 (M.D. Ga.1995)).

[18] *See, e.g.*, *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her."); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1326 (N.D. Ga.2001) ("Plaintiff may support a claim of hostile work environment by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment.").

[19] *Compare Miller*, 277 F.3d at 1276 ("derogatory names [were used] in an intimidating manner"; "[t]he very nature of the coworkers' utterances, coupled with the fact that they were directed at [plaintiff] and were sometimes used in the course of reprimanding him in front of others, establishes [that incidents were humiliating and degrading]"), *with Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756 (8th Cir. 2004) (affirming summary judgment where racial slurs were directed at third parties, not plaintiff, and many of the comments were merely overheard by plaintiff.).

court finds that his allegations are infrequent and too removed in time.  His allegations span over decades and, thus, did not occur with the level of frequency that the Eleventh Circuit has found to be actionable.  While a plaintiff may introduce evidence of conduct occurring outside the statute of limitations period to bolster his hostile work environment claim,[20] the court agrees with Defendant that "[P]laintiffs' inclusion of decades old allegations show that conduct lacks the requisite frequency to be severe or pervasive."  Def.'s Reply (Doc. #48) at 20.  Additionally, Earl Williams has not established (or even alleged) that the alleged conduct unreasonably interfered with his ability to do his job.[21]

Instances in which the Eleventh Circuit has found evidence of a hostile work environment have included evidence of:  1) more frequent conduct, 2) harassment done by the plaintiff's supervisor, and 3) plaintiffs who alleged they were unable to perform their jobs as a result of the alleged harassment.[22]  On the other hand, in cases involving similar conduct

---

[20] *See Nat'l R.R. Passenger v. Morgan*, 536 U.S. 101, 117 (2002) (finding that so long as "an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability").

[21] *See e.g.*, *Cooley v. Great Southern Wood Preserving*, 138 F. App'x 149, 154-55 (11th Cir. 2005) (finding no genuine issue of material fact regarding "discriminatory change in terms and conditions of employment" because "the plaintiffs failed to assert that the conduct was physically threatening or humiliating, or that it interfered with their job performance").

[22] *See, e.g.*, *Miller*, 277 F.3d at 1276–77 (11th Cir. 2002) (finding that a racially hostile work environment existed where supervisor "hurled the ethnic slurs at [the plaintiff] three to four times a day"); *Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 F. App'x 829, 837–38 (11th Cir. 2006) (holding that a jury question existed when there was evidence that racial graffiti permeated the workplace for many years; the plaintiffs discovered seven nooses in less than two years; management directed offensive words, jokes, and statements to minority employees; and employees were unable to perform their jobs effectively).  *See also Webb v. Worldwide Flight Serv., Inc.*, 407 F.3d 1192, 1193 (11th Cir. 2005) (finding evidence sufficient for hostile work

that occurred less frequently and/or the plaintiffs did not demonstrate interference with their job performance, the Eleventh Circuit has found no hostile work environment.[23]

Earl Williams's claims, while describing conduct that might be offensive and certainly unwelcome, are not so severe or pervasive to satisfy the Eleventh Circuit's strict standard. Earl Williams does not, for instance, claim that he was physically abused or threatened; there

environment claim where supervisor referred to plaintiff on a daily basis for two years as a "nigger" and a "monkey," and described him as being "from the tribe"); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (finding that "roughly fifteen separate instances of harassment over the course of four months" was enough to make out a case for a sexually harassing environment).

[23] *See e.g., Alexander v. Opelika City Schools*, 352 F. App'x 390 (11th Cir. 2009) (finding that recalling eight instances over the course of two years where plaintiff was called "boy" was not enough. The Eleventh Circuit affirmed summary Judgment in favor of defendants finding that "none of the alleged racial comments contained threats of physical violence, and [plaintiff] did not demonstrate that the comments interfered with his job performance); *Barrow v. Georgia Pacific Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (finding no hostile work environment even with evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker," as well as two or three threats to "kick [plaintiff's] 'black ass,'" and one supervisor called Plaintiff a "nigger" and threatened to cut him for looking at a white girl; and another supervisor called him "black boy." Allegations reflected conduct that was "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment."); *Washington v. Kroger Co.*, 218 F. App'x 822, 825 (11th Cir. 2007) (finding no racially hostile work environment when a co-worker allegedly hung a figurine representing the plaintiff by a rope and called the plaintiff racially-suggestive names, including "boy"); *Smith v. Beverly Health & Rehab. Serv., Inc.*, 978 F. Supp. 1116, 1122 (N.D. Ga. 1997) (a supervisor's comments that "all that mooly can do is make coffee and bring it to me," "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place," did not rise to the level of severe and pervasive racial harassment); *Quarles v. Con–Way Freight, Inc.*, 2008 WL 1994916, at *7 (M.D. Fla. May 8, 2008) (relying on *Barrow*, found that "six instances of racially-related conduct over a period of a few years," and "approximately four other instances that were reported to [plaintiff]"—which included a supervisor's use of racially offensive terms, using a stuffed animal gorilla to portray a black employee, and being told of a noose that had been shown to another black employee—fell "well short of the required level of severity and frequency to support a hostile environment claim").

is no evidence that any harassment unreasonably interfered with his ability to perform his job duties; and he fails to present evidence that he was humiliated or otherwise hurt by the alleged harassment.[24]   In fact, as Defendant points out, Earl Williams, like the other Plaintiffs, seems to argue he was able to do his job well since he believes he should have been promoted from his current position.  Def.'s Brief (Doc. #37) at 78.  Thus, Earl Williams has not presented sufficient evidence to demonstrate the alleged harassment was sufficiently severe and pervasive.

### b.   Rebecca Williams

Rebecca Williams's hostile work environment claim is based on the following allegations:

- She saw a confederate flag hung in the plant in or around 1990.  Pls.' Brief (Doc. #44) at 13; Rebecca Williams Depo. at 141.
- On one occasion, sometime in or around 1990, co-worker Todd Pryor (white) threw M&M candies at her.  Pls.' Brief (Doc. #44) at 13; Rebecca Williams Depo. at 141.
- For approximately two to three months during the year 1990, white co-workers ate lunch at her work station and left trash.  Rebecca Williams Depo. at 141.
- Approximately two years ago, Rebecca Williams's work station was moved to a position facing the wall after she filed her EEOC charge in March 2009.  Pls.' Brief (Doc. #44) at 10.
- Supervisors would walk past her and tell her white co-workers what they

---

[24] In their Complaint, "Plaintiffs allege that the hostile and discriminatory environment have caused them humiliation and mental distress and have altered the conditions of their employment."  Pls.' Second Am. Compl. (Doc. #16) at 16.  However, they fail to put forth any evidence to substantiate this allegation.  Plaintiffs cannot rely on their pleadings in opposing a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading.").

wanted her to do rather than instructing Rebecca Williams directly.  Rebecca Williams Depo. at 142.

- When she reported a safety violation to Randy Pelham, he told her to just quit. Pls.' Brief (Doc. #44) at 10.
- Over the years, co-worker Robin Thomas (white) has received priority over her in getting her machine fixed when it has malfunctioned.  Pls.' Brief (Doc. #44) at 11.
- She heard a black co-worker, Billy Ward, being called "Charcoal." Pls.' Brief (Doc. #44) at 12; Rebecca Williams Depo. at 143.
- "[M]any, many years ago," she heard it was said "that [Reliable] may have to hire them, but there would be no n_____s in management." Pls.' Brief (Doc. #44) at 11.
- "She heard that she would not get a lead position because of her attitude." Pls.' Brief (Doc. #44) at 13.
- She heard Annie Mae Beall call Erica Barefield "colored girl."[25]  Pls.' Brief (Doc. #44) at 12; Rebecca Williams Depo. at 142.
- Sometime in the year 2000, Rebecca Williams was involved in an argument with an African-American co-worker, Julia Swindle, who said to her, "I'm going to shoot you."  Rebecca Williams then heard a member of management say they could "get rid of two at one time."  Pls.' Brief (Doc. #44) at 12.
- Sometime in 2004, Rebecca Williams saw written on the wall "Carol Lett is a nigger lover."  Rebecca Williams Depo. at 144-45.  Rebecca Williams reported this to her supervisor, Eddie Ward, and the walls were cleaned.  Pls.' Brief (Doc. #44) at 12.
- White employees are able to obtain two or more pairs of gloves and earplugs at a time, but black employees are not allowed to do the same.  Rebecca Williams Depo. at 290-92.
- Sometime in 2008, co-worker Tim Straw showed Rebecca Williams a picture on a cell phone in which a paint shop employee (white) was wearing what resembled a KKK hood.  Rebecca Williams Depo. at 142-43.
- She has witnessed groups of African-American employees being told to get back to work by Lead Person Raymond Anderson (white).  Pls.' Brief (Doc. #44) at 13.
- Rebecca Williams "heard about the hangman's noose, swastikas." Pls.' Brief (Doc. #44) at 12.
- Rebecca Williams alleges that she was not given training, even when she asked for it.  Pls.' Brief (Doc. #44) at 13.
- Rebecca Williams "overheard whites saying that blacks were running away

---

[25] Beall left Reliable sometime in the late 1990s.  Barefield Depo. at 93.

from Obama cause he was going to put them back to work and they didn't want to work." Pls.' Brief (Doc. #44) at 12.

In reviewing Rebecca Williams's allegations, the court finds that she fails to establish a *prima facie* case.

Rebecca Williams's allegations suffer from many of the same weaknesses as Earl Williams's claim. Like Earl Williams, Rebecca Williams also alleges conduct that is too removed in time–spanning from 1990 to the present–and too infrequent to be considered pervasive. Additionally, many of allegations also involve second-hand reports of incidents directed at other employees, which weakens the severity of the allegedly harassing conduct. Finally, like Earl Williams, Rebecca Williams does not allege that the conduct was physically threatening or humiliating, nor does she allege that the conduct unreasonably interfered with her job performance. Thus, Rebecca Williams's hostile work environment claim is due to fail.

### c.    Willie Johnson

Johnson's hostile work environment claim is based on the following allegations:

- Johnson heard from co-worker Andre that there were "Nazi signs" and the words "'We hate niggers'" painted on the wall of the Paint Shop and "confrontations between blacks and whites" ensued as a result. Johnson Depo. at 132-34.
- He heard about the KKK hood incident, which occurred sometime in 2008, from the other Plaintiffs and from co-worker Andre. Johnson Depo. at 142-44.
- He heard about the incident involving three monkey dolls hanging from nooses in the lockers of co-workers Tim, Andre, and Billy. Johnson Depo. at 146.
- He heard that the words, "Carol Lett is a nigger lover" had been written on the

35

    wall of the women's bathroom.  Johnson Depo. at 138-39.
- He heard from co-worker Andre that co-worker "Petey" (white) had a tattoo of a Rebel flag on his head.  Johnson Depo. at 228.
- He heard that co-worker Charles Cox (black) was suspended for using a cell phone.  Johnson Depo. at 245.
- Sometime in 2008, Frank Lett told Johnson about a cartoon, consisting of "a picture of Obama with black people running away from him."  Johnson Depo. at 140-41.
- Approximately two years ago, Johnson saw the racial slurs, "We hate niggers" and "Niggers sucks," written on the bathroom wall.  Johnson Depo. at 136-37.
- Johnson is asked to load and unload metal, which he considers to be outside his job duties.  Johnson Depo. at 209-10.
- Co-worker Jason Kendrick called him "stupid" and "dumb ass."  Johnson Depo. at 217-19.
- Johnson has heard that Barefield was called "colored girl" by co-worker Annie Mae Beall; that Earl Williams was called "boy"; and that Rebecca Williams was called "uppity" and told she had an attitude.  Johnson Depo. at 219.

    Johnson presents a weak claim for hostile work environment.  First, some of his allegations are race neutral and he has not demonstrated that these allegations show a racial animus.  For example, Johnson's allegations that he is assigned tasks outside his job duties and that he has been called "stupid" or "dumb ass" do not establish a racial animus.  *See, e.g.*, *Baker v. FedEx Ground Package System Inc.*, 278 F. App'x 322, 329 (5th Cir. 2008) ("The phrases 'fired girl walking' and 'stupid' are not 'based on race' and, thereby, do not sustain a race-based hostile work environment claim."); *Allen v. Bake-Line Prods., Inc.*, 2001 WL 1249054, at *10 (N.D. Ill. Oct. 17, 2001) (finding that "being called 'stupid,' 'lazy,' a 'motherfucker,' a 'bitch' and the like are not probative of whether a racially hostile work environment existed because these type of statements are not racially motivated" (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345-46 (7th Cir. 1999) (finding that

36

statements like "what the hell is going on?"; "what the hell are you doing?"; "get your head out of your ass"; "dumb motherfucker"; and "when the fuck are you going to get the product[?]" did not "implicate negative attitudes toward African-Americans" and that "[i]t cannot be said with any degree of certainty that the character of these remarks was discriminatory"))).

Moreover, Johnson bases his claim almost entirely on second-hand reports, which as explained above, diminish the severity of his allegations. Johnson's sole allegation of conduct he witnessed first-hand is the offensive language he saw written on the wall two years ago. Even in conjunction with the alleged conduct he's heard of second-hand, seeing writing on a wall two years ago is simply not sufficiently severe or pervasive for Johnson to establish a *prima facie* case.

Thus, the court finds that Johnson's allegations are insufficient to withstand a motion for summary judgment.

### d.    Erica Barefield

Barefield's hostile work environment claim is based on the following allegations:

- In or around 1994, Annie Mae Beall (white) and some other employees called her "colored girl." Barefield Depo. at 86-90. Barefield left Reliable in 1994 and returned in 1995. Upon her return in 1995, Barefield indicates that only Annie Mae Beall and Gilberto Zapata (Hispanic) continued to call her "colored girl" "every now and then." Barefield Depo. at 91.[26]
- In or around the 1990s, Barefield was disciplined for being out of her work area and because of excessive talking. Barefield Depo. at 139, 144-45.

---

[26] Beall has not worked at Reliable since the late 1990s. Barefield Depo. at 93.

- Around five years ago, Barefield was disciplined for malingering in the restroom.  Barefield Depo. at 133-34.
- Barefield heard about the "monkey incident (of 2008)" from Tim Straw.  Pls.' Brief. (Doc. #44) at 52.
- Barefield saw "the picture of the guy with the thing on–the hood on his head. I guess he tried to make it into a KKK thing because it had the little pointy thing up there just like it and everything."  Pls.' Brief. (Doc. #44) at 52; Barefield Depo. at 245.[27]
- Barefield has lupus and was denied the use of a personal heater while a white employee was allowed to have a fan.  Pls.' Brief. (Doc. #44) at 23.
- Barefield was denied an extra pair of gloves by co-worker Jimmy Hall.  Co-workers Yolonda Harrington (white) and Christina Varner (white) get multiple pairs of gloves and other extra safety equipment from Hall.  Barefield Depo. at 255.
- Barefield "has heard racial slurs, constantly at the plant."  Pls.' Brief. (Doc. #44) at 52.
- Barefield has "heard that no n_____ would ever get a management job." Pls.' Brief. (Doc. #44) at 52.
- Barefield heard that Plaintiff Earl Williams was called "boy" by Arnold Boyd. Barefield Depo. at 254.
- Barefield heard that the words "Carol Lett is a nigger lover" were written on bathroom wall.  Pls.' Brief (Doc. #44) at 52; Barefield Depo. at 239.

Barefield's allegations do not establish a *prima facie* case.  Barefield's allegation that she was called "colored girl" is too infrequent to meet the severity and pervasiveness requirement.  Barefield indicates that only Beall and Zapata continued to call her "colored girl" when she was rehired in 1995, but that Beall stopped after she reported the conduct to Raymond Anderson and Eddie Ward.[28]  Additionally, Beall has not worked at Reliable since

---

[27] Barefield indicates she believes Reliable investigated the KKK hood incident, stating "I take it that they did [investigate the incident] because that's when they had that class and then our phones got taken.  I mean, we can't–we're not allowed to have a phone in the plant."  Barefield Depo. at 246.

[28] Anderson spoke with Annie Mae Beall, who was then moved to another work area.  Barefield indicates that she did not hear Beall call her "colored girl" after that, but that "different people

the late 1990s.  Barefield Depo. at 93.  Barefield also indicates that "it's been a while" since Zapata has referred to her as "colored girl" and that he uses that term to refer to her "Maybe once every other month.  It's not regular."  Barefield Depo. at 93-94. Barefield's allegation is not pervasive enough to support a claim for hostile work environment.

Barefield's remaining allegations do not support her harassment claim as they either involve second-hand reports or do not reveal a racial animus.  For example, the fact that she was disciplined for being out of her work area, because of excessive talking, and for malingering in the bathroom, does not demonstrate that she was disciplined because of her race unless she can show that white employees were not disciplined for the same infraction. She revealed that a white co-worker was also disciplined for malingering in the bathroom, Barefield Depo. at 137-38, and, thus, this allegation does not establish a racial bias.

To the extent Barefield argues Defendant provides white employees with preferential treatment because they receive extra safety equipment, she has not demonstrated that these employees receive preferences because of their race.  With respect to her allegation that she was denied a personal heater, Barefield has not presented any evidence that white employees were provided with personal heaters.  Additionally, Defendant has indicated that it has worked with her within the last few years to ensure that she is near a heater.  Def.'s Brief (Doc. #37) at 74. Thus, her claim is also due to fail.

_____

have told [her] that she still referred to [her] as colored girl."  Barefield Depo. at 95-96.

### 2.    Whether Reliable is liable for the conduct.

Even assuming Plaintiffs are able to establish the first four elements of a *prima facie* case on their hostile work environment claim, Defendant can only be held liable for the alleged harassment "if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). *See also Miller*, 277 F.3d at 1278 (employer is directly liable for co-worker harassment if management knew of the harassment (actual notice) or should have known (constructive notice) of the harassment because it was so severe and pervasive).

Defendant argues that there is no basis for liability against Reliable because "it is undisputed both that Reliable had comprehensive, anti-harassment policy, well-known to its employees, including the plaintiffs, and also that the plaintiffs unreasonably failed to take advantage of the policy." Def.'s Brief (Doc. #37) at 84. Further, that "[i]n the few cases where the plaintiffs actually complained, Reliable took appropriate action in response to those complaints." Def.'s Brief (Doc. #37) at 80.

Plaintiffs do not dispute that Defendant's employee handbook contains equal employment opportunity and anti-harassment policies. Pls.' Brief (Doc. #44) at 2. There is also no dispute that Plaintiffs were aware of the reporting procedures and requirements.[29]

---

[29] Plaintiffs' brief indicates the following:

"Earl received a copy of Reliable's policies, on a[t] least three separate occasions, but he has never reviewed it to determine whether there is an anti-harassment policy in it, nor has he discussed an anti-harassment policy with Helms '[because I don't harass nobody].'" Pls.' Brief (Doc. #44) at 3.

Yet, more often than not, Plaintiffs did not report the alleged harassment or otherwise complain about the allegedly racist conduct.  Some undisputed instances in which Plaintiffs failed to report incidents of conduct they allege demonstrate a racial animus include:

**Earl Williams:**
- Earl Williams did not report the presence of a confederate flag in the 1980s. Earl Williams Depo. at 182-83.[30]
- Earl Williams did not report seeing "KKK" and "nigger" written on the bathroom wall.  Earl Williams Depo. at 223-24 & 227.
- Earl Williams "did not report the swastikas on the bathroom wall because everybody knew it." Pls.' Resp. (Doc. #44) at 18.
- Earl Williams "did not report the racial pictures he saw that were circulating about the word 'n_____' and swastikas because management already knew about them." Pls.' Resp. (Doc. #44) at 19.
- Earl Williams did not report having "heard of African-Americans called 'coon(s)' . . . saying it would be useless."  Pls.' Resp. (Doc. #44) at 51.

<u>**Rebecca Williams:**</u>
- Rebecca Williams did not report hearing an unidentified co-worker address Billy Ward over his walkie-talkie as "Charcoal."  Rebecca Williams Depo. at 143-44.
- Rebecca Williams did not report that, sometime in the late 1990s, she heard Annie Mae Beall call Erica Barefield "colored girl."  Rebecca Williams Depo. at 148-49.

---

"Rebecca was 'aware during [her] employment that the handbook said that [she] could and should report discrimination [and] harassment.[']" Pls.' Brief (Doc. #44) at 5.

"Barefield understands that Reliable has policies that prohibit discrimination and harassment. For the past two years, Barefield has understood that she was supposed to report discrimination or harassment, and had an understanding of how to report it."  Pls.' Brief (Doc. #44) at 9.

Plaintiff Johnson received a copy of the Employee Handbook on March 3, 2003 and again on November 28, 2006.  *See* Def.'s Ex. C (Doc. 36-4) at 128-29, "Employee Handbook Acknowledgement of Receipt" signed and dated by Johnson on Mar. 3, 2003 and Nov. 28, 2006.

[30] Earl Williams indicated that he did not complain about the flag because "[he] was scared to." Earl Williams Depo. at 183.

- Rebecca Williams did not report that, sometime in 1990, Todd Pryor "and some other guys" once threw M&M candies at her. Rebecca Williams Depo. at 160.[31]
- Rebecca Williams did not report the allegedly "worse" incidents that occurred after the September 2008 anti-harassment training. Rebecca Williams Depo. at 283.

**Willie Johnson:**
- Johnson did not report hearing about an offensive comment about Carol Lett written on the women's bathroom wall. Johnson Depo. at 139.
- Johnson did not report seeing the racial slurs, "We hate niggers" and "Niggers sucks," written on the bathroom wall. Johnson Depo. at 136-37.
- Johnson did not report hearing that Barefield was called "colored girl" by co-worker Annie Mae Beall; that Earl Williams was called "boy"; and that Rebecca Williams was called "uppity" and told she had an attitude. Johnson Depo. at 219-20.
- Johnson did not report that a white co-worker called him "stupid" and "dumb ass." Johnson Depo. at 218-19.
- Johnson did not report his belief that his attendance-related disciplinary actions were discriminatory. Johnson Depo. at 102-03.

**Erica Barefield:**
- Barefield reported being called "colored girl" sometime in 1995, but has not reported this conduct since then even though she alleges that a co-worker still refers to her that way "every now and then." Barefield Depo. at 91.

*See* Def.'s Brief (Doc. #37) at 85-86; Pls.' Resp. (Doc. #44) at 51.

Plaintiffs do not dispute their failure to report the alleged harassment in the incidents cited above. Their only proffered reason for not reporting the conduct is that everyone knew what was happening and/or that it was useless for them to report the harassment.[32] The

---

[31] Rebecca Williams indicates that she did not report it because "[her] supervisor, Robert McKinney" was standing beside her when the incident occurred, but that he "didn't say a word." Rebecca Williams Depo. at 158-60.

[32] In addition to their own allegations, Plaintiffs present affidavits from other Reliable employees as evidence that the harassment was well-known. Plaintiffs argue these declarations "show notice, both

problem with Plaintiffs' argument is that, while in some cases the Eleventh Circuit has found

that a plaintiff need not avail himself of complaint policies and procedures because these are

ineffective, Plaintiffs have not demonstrated that such exception applies in this case.   In

*Mack*, for example, the Eleventh Circuit found evidence that the employer's "EEO Policy did

not adequately fulfill Title VII's deterrent purpose because it did not provide employees

'alternative avenues for lodging a complaint other than a harassing supervisor'" and that,

therefore, "the complaint procedure was 'defective' and 'dysfunctional.'"   *Mack*, 195 F.

App'x at 840.   In this case, however, the alleged harassment was mostly done by co-workers,

and Plaintiffs clearly were able to complain about incidents of harassment since they did in

fact complain in *some* instances.   Furthermore, Defendant has put forth evidence that in those

instances when a complaint was made, it took action to remedy the situation.   Plaintiffs do

not challenge the instances in which Defendant took action to remedy the situation.   Some

instances in which Plaintiffs did report incidents of alleged harassment include:

- Following the 2008 incident involving three monkey dolls hanging by nooses, Defendant conducted two investigations as well as an anti-harassment training for all employees. Def.'s Brief. (Doc. #37) at 29; Pls.' Resp. (Doc. #44) at 17.
- After Earl Williams complained that Pee Wee Yarborough called him "boy." Defendant's records indicate that Reliable management discussed the situation with Yarborough, instructing him not to do so again.   *See* Record of Conversation, Def.'s Ex. A (Doc. #36-1) at 132.
- Sometime in 2004, Rebecca Williams complained to her supervisor, Eddie Ward, about the graffiti in the women's restroom regarding Carol Lett.  The walls were cleaned the next day.  Rebecca Williams has not seen any racially offensive writing in the ladies' room since then.  Rebecca Williams Depo. at 146-47.

---

actual and constructive. These declarations show an intent to discriminate." Pls.' Resp. (Doc. #51) at 2.

- Rebecca Williams complained to her supervisor, Robert McKinney, about trash being left in her work station, and McKinney had the employees responsible for the trash clean up the area. Over the course of three months, those same employees would leave trash at Williams's workstation, she would report it, and the employees would clean it up. Afterward, the conduct stopped. Rebecca Williams Depo. at 163-64.
- Barefield complained that Annie Mae Beall called her "colored girl." Lead Person Anderson talked to Beall and moved Beall to another work station. Barefield says that she never heard Beall call her "colored girl" again. Barefield asserts, however, that different people told her she still referred to her as colored girl. Barefield Depo. at 95-96.

*See* Def.'s Brief (Doc. #37) at 80. Defendant also investigated the incidents involving the KKK hoodie and the incident involving the Obama cartoon after other employees reported the conduct. Def.'s Brief (Doc. #37) at 80.

This case is similar to *Barrow* in which the plaintiffs failed to use the employer's procedures and policies for reporting racial harassment and the employer promptly remedied those offenses that did come to its attention. In *Barrow*, the Eleventh Circuit noted that

> most of the plaintiffs have failed to demonstrate a basis for holding [the employer] liable. Out of these six employees, four never reported any kind of actionable racial discrimination to [the employer], although all admitted they understood the procedure for reporting harassment. And, of the two employees that did complain, one admitted that [the employer] investigated his complaint and punished the person responsible for the harassment.

*Barrow*, 144 F. App'x at 58, n.1 Indeed, "[a]lthough the Supreme Court and the Eleventh Circuit have not explicitly required an employee to complain . . . about perceived hostile behavior, the evidence, or lack thereof, of complaints is relevant in weighing the severity of the environment. . . . The absence of complaints is a factor that belies a suggestion of

severity." *Buckhanon v. Huff & Assoc. Const. Co., Inc.*, 506 F. Supp. 2d 958, 967 (M.D. Ala. 2007). The evidence on the record suggests that Plaintiffs failed "to take full advantage of [Defendant's] preventative and/or remedial measures," *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1306-07 (11th Cir. 2007), and, thus, Plaintiffs have not presented sufficient evidence to withstand summary judgment on element five of their *prima facie* case.

In sum, Plaintiffs fail to create a genuine issue of material fact with regard to their claim for hostile work environment. Plaintiffs do not provide sufficient evidence to establish that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment. Moreover, the evidence suggests that Defendant took remedial action to end the alleged harassment when it was reported. Based on the foregoing facts and analysis, the court finds that Plaintiffs' claim for hostile work environment cannot survive Defendant's Motion for Summary Judgment.

## IV.    MOTION TO STRIKE

Defendant has also moved to strike declaration affidavits provided by Plaintiffs as part of their evidentiary submission in support of their opposition to summary judgment.

Following the parties' pleadings in support of and in opposition to the Motion to Strike, the only declarations that remain in dispute are those of Greg Simpson, Evelyn Thurman, Donny Brown, Horace Lamar, Lovela Scott, Ted Hampton, and Ginny Franklin. As to the substance of the declarations, Defendant argues that "[t]o allow the above-listed declarations into this record would not serve any probative purpose regarding these

plaintiffs' claims.   Many of the declarants offer testimony which, if believed, arguably references causes of action unique to each of *them,* but which does not pertain to the specific allegations raised by Plaintiffs in this action."   Def.'s Motion to Strike (Doc. #49) at 1 (emphasis in original).   Plaintiffs' Response to the Motion to Strike indicates that "[t]hese declarations show notice, both actual and constructive. These declarations show an intent to discriminate."   Pls.' Resp. (Doc. #51) at 2.

The court has reviewed the affidavits and declarations.   The evidence consists of mostly general allegations but includes declarations from individuals who experienced allegedly racial harassment first-hand.   Viewed in light most favorable to Plaintiffs, the court finds that the affidavits and declarations demonstrate some hostility toward African American employees.   However, with respect to Plaintiffs' failure to promote claim, the court finds the evidentiary submissions are insufficient to rebut Defendant's legitimate nondiscriminatory reason and, thus, Defendant is still entitled to summary judgment as to this claim.   With respect to Plaintiffs' hostile work environment claim, the court finds the declarations are insufficient to establish the existence of severe and pervasive conduct as required to establish a hostile work environment claim.   *See, e.g.*, *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996) (holding that affidavits containing "numerous charges of disparate treatment and hostile work environment that are made in general, conclusory terms, but [in which] names, times and occasions are missing" did not create issue of fact as to pretext.   The court found that "the affidavits are filled with statements of the subjective beliefs of the

affiants that [Defendant] was hostile to its African employees and treated them differently from other employees.").

The court did consider the affidavits, as reflected in this opinion, and denies Defendant's motion.

**V.     CONCLUSION**

For the reasons stated in this opinion, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. #35) is GRANTED and this case is DISMISSED.  It is further

ORDERED that Defendant's Motion to Strike (Doc. #49) is DENIED.

A separate Judgment will issue.

Done this 1st day of March, 2012.

                                        /s/ Wallace Capel, Jr.
                                        WALLACE CAPEL, JR.
                                        UNITED STATES MAGISTRATE JUDGE